**Judith SMITH, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1587.**

Supreme Court of Alaska.

May 25, 1973.

Lawrence J. Kulik, Asst. Public Defender, Herbert Soll, Public Defender, Anchorage, for appellant.

Stephen G. Dunning, Asst. Dist. Atty., Seaborn J. Buckalew, Dist. Atty., Anchorage, John E. Havelock, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

OPINION

CONNOR, Justice.

Appellant was convicted by a superior court jury of unlawful and felonious possession of heroin in violation of AS 17.10.-010. Three days prior to trial, appellant moved to suppress as evidence all property seized during execution of a search warrant issued September 4, 1970, by district court Judge Dorothy O. Tyner. In that motion appellant alleged that the search

warrant was issued upon information obtained by three illegal searches. This appeal is based on the denial of that motion.

On or about August 22, 1970, appellant and one Charles Smith occupied Apt. No. 409 of the Caye Ann Apartments, located at 731 B Street in Anchorage. Having received information that Charles Smith was involved in narcotics activities, Investigator Dean Bivens of the Alaska State Troopers instituted on August 22, 1970, a "stakeout" giving 24-hour coverage of the Caye Ann Apartments. This surveillance lasted approximately 12 days.

Investigator Bivens and the state troopers who worked with him operated from a camp trailer across B Street from the Caye Ann Apartments. This vantage point afforded them a view both of the apartment building and of the dumpster garbage receptacle located outside the building, adjacent to the northwest corner of the building, closest to B Street. Bivens specifically assigned the troopers manning the stakeout to remove garbage placed in the dumpster by either Charles Smith or the appellant.

In addition to the dumpster located outside the apartment building, the facilities of the Caye Ann Apartments included an indoor garbage room located on the ground floor, equipped with a 20-gallon garbage hand cart. At the time in question, it was the practice of the resident manager of the apartment building to empty the contents of the 20-gallon hand cart into the dumpster whenever the hand cart became filled up. The dumpster itself was slightly sheltered by an overhang of the building. Municipal refuse collection was made exclusively from the dumpster and not from the indoor garbage room.

On August 22, 1970, Trooper Wes Taylor removed two bags of garbage which he had seen Charles Smith place in the dumpster. On August 31, Trooper Casper Johnsen removed a tan colored plastic garbage bag, which he had seen appellant place in the dumpster. On September 2, Trooper Taylor again removed items from the dumpster which he had seen Charles Smith, accompanied by appellant, place there. Each of the bags or other containers thus obtained was opened by Investigator Bivens and the contents of each provided evidence that occupants of Apt. No. 409 were involved with unlawful drugs.

On the basis of the evidence taken from the dumpster, a search warrant was subsequently issued, and a number of drug-related items were found in the apartment, including marijuana, cigarette papers, hypodermic syringes and, in a paper "slip", approximately one gram of a brownish powder which chemical analysis proved to be unusually pure heroin. In addition, the troopers found and seized a can of "milk sugar", a substance commonly used to dilute heroin before use.

Appellant contends that the police activity outlined above constitutes an illegal search. Specifically, she argues that official removal and examination of the contents of various bags and other garbage receptacles placed in the dumpster by herself and Charles Smith violates both the Fourth Amendment of the United States Constitution[1] and Article I, Section 14, of the Alaska Constitution.[2] In short, appellant reads both constitutions to require that the police should have demonstrated probable cause to an independent magistrate and secured a search warrant before undertaking the search of Smith's garbage.[3]

1. The United States Constitution, Fourth Amendment, provides in part:
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, . . ."

2. The Alaska Constitution, Article I, Section 14, provides in part:

"The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated."

3. *See, e. g.*, Katz v. United States, 389 U.S. 347, 356–357, 88 S.Ct. 507, 514, 19 L.Ed. 2d 576, 585 (1967).

We disagree, and we hold that the trial court's failure to grant appellant's motion to suppress does not constitute error. However, inasmuch as we are profoundly committed to the preservation of personal privacy and deeply sensitive to the dependence of our most cherished rights upon judicial vindication, we are unwilling to announce a general rule sanctioning official gathering and analysis of an individual's refuse. Accordingly, we limit our holding to the particular facts of the case at bar.[4]

■ We commence our analysis with the observation that the protection of the Fourth Amendment does not extend to abandoned property.[5] Using traditional property law concepts, we find it difficult to avoid the conclusion that any items of garbage placed in a receptable outside the dwelling—and certainly the items removed from the dumpster in the case at bar—are abandoned. In the words of one recent scholar:[6]

"In the law of property, it has been recognized that the act of abandonment is demonstrated by an intention to relinquish all title, possession, or claim to property, accompanied by some type of activity or omission by which such intention is manifested. As one court has stated:

'The abandonment of property is the relinquishing of all title, possession, or claim to or of it—a virtual *intentional* throwing away of it. It is *not presumed*. Proof supporting it must be direct or affirmative or reasonably beget the exclusive inference of the throwing away.'" [Emphasis added by Mascolo].[7]

"It is apparent that the agents in this case acted with restraint. Yet the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer. They were not required, before commencing the search, to present their estimate of probable cause for detached scrutiny by a neutral magistrate. They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order. Nor were they directed, after the search had been completed, to notify the authorizing magistrate in detail of all that had been seized. . . . 'Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes,' United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59, 64, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." [Footnotes omitted].

4. Although under Baker v. Fairbanks, 471 P.2d 386, 401–402 (Alaska 1970), we may interpret our own constitution more expansively than the comparable federal constitutional provision, we are not persuaded that such should be done in this case.

5. United States v. Mustone, 469 F.2d 970, 972 (1st Cir. 1972), Mascolo, *The Role of Abandonment in the Law of Search and Seizure: An Application of Misdirected Emphasis*, 20 Buff.L.Rev. 399, 400–01 (1970), and cases cited therein [cited hereafter as Mascolo].

6. Mascolo at 401–02.

7. Foulke v. New York Consol. R. R., 228 N.Y. 269, 127 N.E. 237, 238 (1920), *quoted with approval in* United States v. Cowan, 396 F.2d 83, 87 (2d Cir. 1968) (cases cited by Mascolo at 402 n. 14).

We note in passing that Mascolo would rest a finding of abandonment on federal constitutional law rather than on local property concepts in light of the "conclusive effect of abandonment under the [F]ourth [A]mendment [being] the termination of an individual's right, or expectation, of privacy in a particular piece of property." Mascolo at 402. We take a somewhat different view. In our opinion, the legality of the search turns not on the nature of the refuse but on whether the receptacle lies within the zone of protection afforded by the Fourth Amendment. Thus property which is abandoned but which rests in a receptacle temporarily maintained inside a dwelling could not be searched or seized by the police unless a warrant had issued.

*See, e. g.*, State v. Purvis, 249 Or. 404, 438 P.2d 1002 (1968). A police officer suspected the defendant of possession of marijuana. He requested maids working

■ We view the sequence of an individual's placing an article in a receptacle, from which routine municipal collections are made, and then withdrawing from the area [8] as activity clearly indicative of "an intention to relinquish all title, possession, or claim to property." [9]

A determination that the refuse retrieved by the state troopers in this case was abandoned, however, is not conclusive of the reasonableness of their search. As the United States Supreme Court said in Katz v. United States:

"[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See Lewis v. United States, 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312, 315; United States v. Lee, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202, 1204. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. See Rios v. United States, 364 U.S. 253,

in the hotel where defendant resided to bring him the contents of the defendant's wastebasket, which were emptied as part of the maids' normal duties. Of the objects removed from the wastebasket, the court said:

"The objects which defendant deposited in the ash trays and waste baskets can be regarded as abandoned property. *During the time the discarded property remained in the room the police were not entitled to seize it, not because defendant claimed a right of privacy in these items, but because the right to the privacy of the room itself would be invaded by such a seizure.* However, the removal of the contents of the ash trays and waste baskets into the hallway by the maids, who were privileged to be in the room and were authorized to remove trash in cleaning it, did not constitute an unlawful invasion of defendant's privacy." [Emphasis added]. 438 P.2d at 1005.

8. Investigator Biven's Affidavit for Search Warrant reads in part:

"That on the 22nd day of August 1970, at approximately 5:15 p. m., Trooper Wes Taylor informed me of the following:

(a) That he had observed Charles E. Smith exit the CayeAnn Apartments located at 731 B Street in Anchorage at approximately 11:59 a. m. on the 22nd day of August, 1970.

(b) That Charles E. Smith had in his possession two (2) yellow grocery bags with the name "CARR'S" written on the side.

(c) That Charles E. Smith placed the two (2) yellow "CARR'S" grocery bags into the CayeAnn Apartments dumpster located at the northwest corner of the apartment building.

(d) That Charles E. Smith entered a black over blue 1970 Cadillac Alaska License #6673 and departed the area.

"That on or about the 31st day of August, 1970, at approximately 9:30 p. m., I conferred with Trooper Casper Johnsen and he indicated the following had transpired on the 31st day of August, 1970:

(a) That he had observed a person known to him as Judy Lee Smith exit the CayeAnn Apartments, located at 731 B Street, Anchorage, Alaska, at approximately 3:35 p. m.

(b) That at that time Judy Lee Smith had in her possession a tan colored plastic garbage bag.

(c) That she proceeded to a dumpster which serves the residents of the CayeAnn Apartments, which is located at the northwest corner of that building.

(d) That Judy Lee Smith deposited the tan colored plastic garbage bag in the dumpster and then re-entered the CayeAnn Apartments.

(e) That Trooper Casper Johnsen had occasion to observe the CayeAnn Apartments dumpster continuously and without interruption from 3:34 p. m., when the tan colored plastic garbage bag was deposited by Judy Lee Smith, until 4:10 p. m., when it was personally removed from the dumpster by Trooper Johnsen.

(f) That during the above interval between 3:34 p. m. and 4:10 p. m., no one approached nor deposited garbage in the dumpster which contained the tan colored plastic garbage bag."

9. Mascolo at 401. It is, of course, possible that variations on this fact pattern might require a different conclusion. Intentional concealment, for instance, is not an act of abandonment. *See* State v. Chapman, 250 A.2d 203, 212 (Me.1969), cited in Mascolo at 402 n. 14.

80 S.Ct. 1431, 4 L.Ed.2d 1688; Ex parte Jackson, 96 U.S. 727, 733, 24 L.Ed. 877, 879." 389 U.S. at 351–352, 88 S.Ct. at 511, 19 L.Ed.2d at 582.

Expanding on this theme in Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed. 2d 889, 899 (1968), the Court added:

". . . and wherever an individual may harbor a reasonable 'expectation of privacy,' [389 U.S.] at 361, 88 S.Ct. at 516 [19 L.Ed.2d at 588] (Mr. Justice Harlan, concurring), he is entitled to be free from unreasonable governmental intrusion." (Citation in brackets added.)

The nourishment we derive from these two propositions is this: if appellant can be said to have harbored a "reasonable expectation of privacy" in the dumpster, then the protection afforded by the Fourth Amendment extends to that receptacle and the warrantless search is illegal.

The question presented by this case, in short, is how to determine whether a reasonable expectation of privacy exists here. Our touchstone is Justice Harlan's separate concurrence in Katz:

"My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable'. Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited." 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 587–588.

On the record before us, we are not satisfied that either test has been met.

■ First, appellant's and Charles E. Smith's activities of depositing garbage in the dumpster and withdrawing from the area, described in Investigator Biven's Affidavit for Search Warrant,[10] were clearly exposed to plain view. The dumpster was located outside the building, appurtenant to the corner of the building nearest the street. The trips were made during daylight hours. Any passerby could have easily observed appellant's or Smith's various trips. No attempt was made to empty the bags or boxes or to commingle their contents with the collective mass of garbage. Any person later emptying refuse in the dumpster could easily segregate the items placed therein by the Smiths. Had they wished to keep their activities to themselves, the Smiths could easily have left any items of garbage in the 20-gallon hand cart located in the indoor garbage room. On these facts, we are satisfied that appellant harbored no "actual (subjective) expectation of privacy".[11]

But even assuming arguendo that the facts overwhelmingly indicated appellant's subjective expectation of privacy, this court is unable to hold that "society is prepared to recognize [such an expectation] as 'reasonable,'" at least in the case at bar.

To be sure, the question is very close. A review of several recent garbage can search cases [12] reveals a basic core of factors to be considered in determining whether a reasonable expectation of privacy exists. These factors are:

1. Where the trash is located,

2. Whether the dwelling is multiple or single unit,

10. See n. 8 supra.

11. While it is unclear on this record whether the various items, as they rested in the dumpster, were exposed to plain view, that is of no consequence to this analysis.

12. United States v. Mustone, 469 F.2d 970 (1st Cir. 1972); United States v. Dzialak, 441 F.2d 212 (2d Cir. 1971);

People v. Krivda, 5 Cal.3d 357, 96 Cal. Rptr. 62, 486 P.2d 1262 (1971), vacated and remanded for a determination of whether the holding has a state or federal basis, 409 U.S. 33, 93 S.Ct. 32, 34 L. Ed.2d 45 (1972); People v. Edwards, 71 Cal.2d 1096, 80 Cal.Rptr. 633, 458 P.2d 713 (1969); State v. Purvis, 249 Or. 404, 438 P.2d 1002 (1968).

3. Who removed the trash,

4. Where the search of the trash takes place.

One may readily arrange these factors to form a continuum. At one end of the continuum is trash located close to a single-family dwelling, on the same property as the dwelling, and searched by police officers at that location. We observe, without so deciding, that this would be a strong case for holding the expectation of privacy to be reasonable. At the other end of the continuum is trash located off the premises of a multiple-unit dwelling, and searched by a person authorized to remove it. In such a case we would be unable to hold that the expectation of privacy was reasonable.

The instant case presents an on-premises search by police officers of a multiple-dwelling trash receptacle from which municipal collections were made. We note at the outset that almost every human activity ultimately manifests itself in waste products and that any individual may understandably wish to maintain the confidentiality of his refuse. As the California Supreme Court stated in People v. Edwards:

"We can readily ascribe many reasons why residents would not want their cast-away clothing, letters, medicine bottles or other telltale refuse and trash to be examined by neighbors or others, . . . Half truths leading to rumor and gossip may readily flow from an attempt to 'read' the contents of another's trash." 80 Cal.Rptr. 633, 638, 458 P.2d 713, 718 quoted in, 96 Cal.Rptr. 62, 68, 486 P.2d 1262, 1268.

▇ Understandable as this desire for confidentiality may be, it is not conclusive of society's willingness to recognize an expectation of privacy in a garbage receptacle as reasonable. Turning to the dumpster in the case at bar, we are impressed with the combination of several factors. To begin with, this dumpster accommodated several apartments. Therefore many people living in the building—and certainly the superintendent—would conceivably have occasion to look into it and scavenge about in the collective heap. Secondly, all municipal pickups were made from this dumpster. Therefore, any tenant in the Caye Ann Apartments could be sure that periodically a group of third persons would look into the dumpster and possibly scavenge items therefrom. Thirdly, the dumpster was located outside the building in the parking area. Therefore, it would be reasonable to expect trash to be accidentally removed from the dumpster by running children, passing cars, stray dogs, or even a visitor of another tenant in the building. Taking these various factors together, we are unable to conclude that appellant could have harbored an objectively reasonable expectation of privacy in the dumpster.[13]

We are urged, however, to adopt a concept of differential expectations of privacy. We are cited to State v. Stanton, 490 P.2d 1274 (Or.App.1971), in which the Court of Appeals of Oregon stated:

"We recognize that while it may not be objectively reasonable for a person to expect privacy as to one class of persons or persons with one purpose, he may reasonably expect privacy as to the same or other classes with other purposes. A person may not expect privacy in his open field or backyard as against children at play or parents looking for lost or tardy children. Yet he may subjectively expect and objectively be entitled to expect privacy as against policemen making a 'dragnet' search of a whole group of private fields or a whole neighborhood of backyards in the assumption that if they search long enough and far enough they will find some evidence of some crime." 490 P.2d at 1279.[14]

13. *See* Work v. United States, 100 U.S. App.D.C. 237, 243 F.2d 660, 663 (1957) (dissenting opinion by Burger, Circuit Judge).

14. See also People v. Krivda, 5 Cal.3d 357, 96 Cal.Rptr. 62, 69, 486 P.2d 1262, 1269 (1971):

"Of course, one must reasonably anticipate that under certain circum-

That view we decline to adopt in this case. In our opinion, the reasoning which would openly countenance scavenging in the dumpster by an indeterminate number of third persons, freely admit a constant invitation to the public authorities of the municipality to remove the contents, yet require the police to secure a search warrant before pursuing their investigation is too attenuated. Accordingly, we hold that the trial court's denial of defendant's motion to suppress did not constitute error.

Affirmed.

FITZGERALD, J., did not participate.

RABINOWITZ, Chief Justice (dissenting).

I cannot agree with the majority's conclusion that appellant did not possess a reasonable expectation of privacy from governmental intrusion into her garbage which was deposited in the dumpster. In my view, her expectation was both reasonable and protected by the fourth amendment to the United States Constitution [1] and article I, section 14 or article I, section 22 of the Alaska constitution.[2] Thus, I

would hold that the warrantless search conducted in the instant case was unreasonable and unconstitutional, and would therefore reverse the trial court's denial of appellant's motion to suppress.

At the outset, I think it is essential to recognize that a free and open society cannot exist without the right of the people to be immune from unreasonable interference by representatives of their government. In order to preserve and protect this right of privacy, our Founding Fathers promulgated the fourth amendment to the United States Constitution. As the United States Supreme Court has repeatedly observed:

> The basic purpose of [the Fourth] Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.[3]

Fourth amendment rights of the people, as well as the rights of Alaskan citizens under article I, section 14 or article I, section 22 of our constitution, are to be jealously guarded by the courts, and any governmental invasion of individuals' privacy is to be authorized only when reasonable

---

stances third persons may invade his privacy to some extent. It is certainly not unforeseen that trash collectors or even vagrants or children may rummage through one's trash barrels and remove some of its contents. However, as stated in People v. McGrew, 1 Cal. 3d 404, 412, 82 Cal.Rptr. 473, 478, 462 P.2d 1, 6, 'The hotel guest may reasonably expect a maid to enter his room to clean up, but absent unusual circumstances he should not be held to expect that a hotel clerk will lead the police on a search of his room.' "

1. The fourth amendment to the United States Constitution provides in pertinent part:
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,
> . . .

2. Alaska Const. art. I, § 14 provides in pertinent part:
> The right of the people to be secure in their persons, houses and other property, papers, and effects, against un-

reasonable searches and seizures, shall not be violated. . . . (Emphasis added.)

Alternatively, in accordance with this court's duty "to develop additional constitutional rights and privileges under our Alaska Constitution . . .," Baker v. City of Fairbanks, 471 P.2d 386, 402 (Alaska 1970), I would hold that appellant's reasonable expectation of privacy was protected by the recently adopted article I, section 22 of the Alaska constitution. Specifically, that section provides:
> The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section.

3. Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935 (1967). The fourth amendment has been made applicable to the states through the fourteenth amendment. Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

and undertaken in accordance with the strict requirements of judicial process pertaining to the issuance of a search warrant. In regard to situations where a search warrant is not necessary, the Supreme Court of the United States in Coolidge v. New Hampshire,[4] cautioned that:

> The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.' (Footnotes omitted.) [5]

With few exceptions, the well-recognized rule is that governmental searches may be constitutionally conducted only pursuant to valid search warrants. As the United States Supreme Court stated in Katz v. United States: [6]

> Searches conducted without warrants have been held unlawful [6] notwithstanding facts unquestionably showing probable cause,' . . . for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer . . . be interposed between the citizen and the police . . . .' . . . 'Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes,' . . . and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions. (Footnotes and citations omitted.) [7]

In my judgment, it is preferable to entrust the decision to invade citizens' privacy to the scrutiny of neutral judicial officials rather than police officers—even police officers operating under great self-restraint. As the United States Supreme Court noted in McDonald v. United States: [8]

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.[9]

Here, the troopers failed to comply with the warrant rule. That is, without possessing a valid search warrant, they inspected and seized portions of appellant's garbage which were deposited in the dumpster. Accordingly, unless the present warrantless search falls within one of the narrow exceptions to the warrant-requirement rule, I would hold that the search was unconstitutional under both the federal and state constitutions.

I commence my analysis by noting that the fourth amendment and Alaska's constitution protect persons rather than physical locations. I note further that the "private" or "public" nature of the physical surroundings in which the claim to privacy is asserted is irrelevant for purposes of con-

4. 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, rehearing denied, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971).

5. Id. at 455, 91 S.Ct. at 2032, 29 L.Ed.2d at 576.

6. 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

7. Id. at 357, 88 S.Ct. at 514, 19 L.Ed.2d at 585; see also McCoy v. State, 491 P.2d

127, 132 (Alaska 1971); Ferguson v. State, 488 P.2d 1032, 1036–1037 (Alaska 1971); Sleziak v. State, 454 P.2d 252, 256 (Alaska 1969).

8. 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

9. Id. at 455–456, 69 S.Ct. at 193, 93 L.Ed. at 158; see also Katz v. United States, 389 U.S. 347, 356, 88 S.Ct. 507, 19 L.Ed. 2d 576, 585 (1967).

stitutional analysis. As the United States Supreme Court stated in *Katz:*

> What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. . . . (Citations omitted.) [10]

More precisely, the constitutions afford protection to personal "expectations of privacy" which are reasonable. In Terry v. Ohio,[11] the United States Supreme Court stated:

> We have recently held that 'the Fourth Amendment protects people not places,' . . . and wherever an individual may harbor a reasonable 'expectation of privacy,' . . . he is entitled to be free from unreasonable governmental intrusion. (Citations omitted.) [12]

In this regard, I find little utility in the majority's references to the physical location of the dumpster; to a "core of factors" which includes the location of the trash; and to its importation into the realm of constitutional analysis of "traditional property law concepts" such as "abandonment" and "relinquishment of title, possession or claim to property." In the case at bar, we are concerned with the determination of constitutional rights rather than spatial relationships or property interests. According significance to these factors, in my view, led the court to adopt an unworkable test which imposes upon appellant an impossible burden. That is, the court employs the test laid down by Justice Harlan in his separate concurring opinion in *Katz*.[13] Under that formula, appellant must meet two requirements: he must establish "an actual (subjective) expectation of privacy," and he must show that this expectation is "one that the society is prepared to recognize as 'reasonable.'" In my opinion, establishing a person's subjective expectations or mental attitudes will be extremely difficult, if not impossible, in most cases. It seems to me to be preferable to consider the external, behaviorial manifestations of an individual in order to ascertain his or her expectations of privacy. In this regard, I would adopt and apply the two-pronged test set forth by the California Supreme Court in People v. Edwards.[14] In *Edwards,* the court articulated the following formula:

> . . . [W]e believe that an appropriate test is whether the person has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion.[15]

In that case, two defendants were convicted of possession of marijuana for sale. The evidence relied upon at their trial had been obtained in a warrantless trash can search. There, two policemen, acting upon information provided by defendants' neighbor, "walked down the railroad tracks behind defendants' residence and entered into 'the open back yard area' of that residence." The policemen then conducted an unauthorized search of three trash cans located two or three feet away from defendants' back porch, eventually uncovering a bag containing marijuana. There, the California Supreme Court reversed the convictions, holding that defendants possessed a reasonable expectation of privacy in regard to their trash cans, and that such expectation had been violated by an unreasonable governmental intrusion. Two years later,

10. 389 U.S. 347, 351–352, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967).

11. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

12. *Id.* at 9, 88 S.Ct. at 1873, 20 L.Ed.2d at 899.

13. 389 U.S. 347, 360–362, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 587–588 (1967).

14. 71 Cal.2d 1096, 80 Cal.Rptr. 633, 458 P.2d 713 (1969).

15. *Id.* at 1098, 80 Cal.Rptr. at 635, 458 P.2d at 715; *see also,* People v. Krivda, 5 Cal.3d 357, 96 Cal.Rptr. 62, 486 P.2d 1262 (1971), vacated and remanded for determination of whether holding had state or federal basis, 409 U.S. 33, 93 S.Ct. 32, 34 L.Ed.2d 45 (1972).

*Edwards* was followed by the California Supreme Court in People v. Krivda.[16] In *Krivda,* the defendants had set several trash barrels "on the parkway adjacent to the sidewalk" in front of their single family residence. Police officers halted approaching refuse collectors, requested them to first empty their truck well, next pick up defendants' trash, and then permit the officers to inspect the contents of the defendants' garbage shortly thereafter. During such warrantless search, the police found quantities of marijuana. Acting at a "reopened" suppression hearing, the trial court granted defendants' motion to suppress and dismissed the action. The California Supreme Court denied the prosecution's appeal from the dismissal order, holding that "defendants had a reasonable expectation that their trash would not be rummaged through and picked over by police officers acting without a search warrant," and that such expectation had been violated by an "unreasonable governmental intrusion."

Several factual similarities exist between *Krivda* and the case at bar. In both cases, the occupants of their respective dwelling units deposited their trash in the only receptacles available for their living facility. In both cases, the seized contraband could not have been seen or discovered without the police actively rummaging through the contents of the refuse containers. In both cases, the identity of the source of the trash had not yet been destroyed through the commingling of the deposited garbage with the other trash; police could and did clearly trace particular pieces of garbage back to the defendants. In both cases, it is reasonable to infer from the defendants'

conduct that while they may have anticipated some inadvertent inspection of their trash by third persons, such as garbage collectors, children or passersby, they did not necessarily expect that law enforcers would be picking through each scrap of their refuse. And while in *Krivda* the trash cans were set immediately adjacent to the street in preparation for pick-up and removal, the dumpster in the case before us was located close to the apartment building, "just under cover" of the overhang of the structure. According to the majority's physical-location analysis, the positioning of the garbage cans in *Krivda* would seem to suggest an even greater intention to "abandon" the property on the part of the defendants than exists here.

Like the California Supreme Court in *Krivda,* I am persuaded that in the instant case, appellant exhibited a reasonable expectation of privacy with respect to the garbage she deposited in the dumpster. The refuse was not strewn openly onto the public streets, sidewalks, or into a public dump, where it could be sorted through and examined by anyone. Rather, the trash was deposited into a dumpster: the apartment building waste receptacle whose very sides, shape and structure would seem to discourage rather than invite human inspection of the materials deposited therein. Appellant's garbage was not "commingled" or mixed together with the other trash so as to destroy the identity of its source.[17] Nor were the contents of the garbage bag tossed casually upon the top of the stack of existing refuse "in plain view" of any passerby. Rather, they were wrapped up inside of *closed* containers: two yellow grocery bags; a tan colored

---

16. 5 Cal.3d 357, 96 Cal.Rptr. 62, 486 P.2d 1262 (1971), vacated and remanded for determination of whether holding had state or federal basis, 409 U.S. 33, 93 S.Ct. 32, 34 L.Ed.2d 45 (1972).

17. As the California Supreme Court observed in People v. Krivda, 5 Cal.3d 357, 363, 96 Cal.Rptr. 62, 68, 486 P.2d 1262, 1268 (1971):
'We can readily ascribe many reasons why residents would not want their

castaway clothing, letters, medicine bottles or other telltale refuse and trash to be examined by neighbors or others, *at least not until the trash had lost its identity and meaning by becoming part of a large conglomeration of trash elsewhere.* Half truths leading to rumor and gossip may readily flow from an attempt to "read" the contents of another's trash.' (Emphasis in original.) (Citations omitted.)

plastic garbage bag; a Schlitz beer box and a brown paper bag. Indeed, Inspector Bivens and the state troopers were obliged to first open the containers and remove the contents in order to examine and seize the contraband. Additionally, appellant's garbage had not been dropped into the interior hand cart and left there for the apartment manager to dump into the larger, exterior waste receptacle. Rather, appellant and her husband personally deposited the containers into the dumpster, arguably to ensure that their garbage would not be handled by third persons. These facts suggest to me that appellant did not intend to knowingly expose to the public the contents of her garbage bags; that she possessed a reasonable expectation of privacy, at least from government officials, with respect to her trash.

Rather than focusing upon the physical location of the dumpster and property law notions of abandonment of ownership interests, I would focus upon appellant's behavior in an effort to determine whether or not she intended to knowingly disclose to the public, publicly communicate, or publicize the contents of her garbage. For instance, when one enters a public telephone booth, closes the door behind him and conducts a telephone conversation, that person demonstrates a reasonable expectation that the nature of the discussion will remain confidential; the caller does not behaviorally manifest an intention to publicize or publicly disclose the contents of the telephone conversation. In such an instance, the fourth amendment as well as Alaska's constitution extend protection to the contents of the telephone call.[18] By analogy to the instant case, one who inserts refuse into a garbage bag, seals the bag and personally deposits the bag into the only waste facility available for his dwelling place does not manifest an intention to publicly communicate or disclose

the contents and identity of the garbage. Here too, the protection afforded by the fourth amendment and Alaska's parallel constitutional provision should obtain.

Without elaborating, the court rejects as being "too attentuated" appellant's theory of "differential expectations of privacy" and in so doing fails to recognize that citizens might expect a few, infrequent invasions of their privacy by third persons, but might simultaneously expect their privacy to remain immune from governmental intrusion. I disagree. A telephone caller, for example, who conducts a conversation on a "party line" might reasonably expect brief interruptions from others who were attempting to ascertain if the line were in use. It does not necessarily follow, however, that the same caller would also expect that government agents might be conducting a full-scale warrantless "search" or tap of his conversations. Similarly, one who deposits refuse into a dumpster might expect some minor, inadvertent examination by garbagemen or other third persons, but such expectations would not necessarily include a detailed, systematized inspection of the garbage by law enforcement personnel. As the California Supreme Court correctly observed in *Krivda*:

> Of course, one must reasonably anticipate that under certain circumstances third persons may invade his privacy to some extent. It is certainly not unforeseen that trash collectors or even vagrants or children may rummage through one's trash barrels and remove some of its contents. However, as stated in People v. McGrew, 1 Cal.3d 404, 412, 82 Cal.Rptr. 473, 478, 462 P.2d 1, 6, 'The hotel guest may reasonably expect a maid to enter his room to clean up, but absent unusual circumstances he should not be held to expect that a hotel clerk will lead the police on a search of his room.' [19]

18. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

19. 5 Cal.3d 357, 364, 96 Cal.Rptr. 62, 69, 486 P.2d 1262, 1269 (1971); *see*

*also* State v. Stanton, 490 P.2d 1274, 1279 (Or.1971), where the Oregon Supreme Court observed:
We recognize that while it may not be objectively reasonable for a person to

Further, such differential expectations of privacy would seem to exist regardless of where the trash receptacle was located. The court contends that it is reasonable to expect that refuse deposited in the dumpster in the case at bar might be "accidentally removed" or inadvertently observed "by running children, passing cars, stray dogs or even a visitor . . . ." It seems to me that it is equally reasonable to expect that garbage deposited in a trash can servicing a single family dwelling might also be seen by passing children, dogs or strangers. Yet, in both instances, the expectation of privacy against governmental invasion would remain undiminished. Indeed, the majority seems to impliedly acknowledge this by conceding that "trash located close to a single family dwelling" would present "a strong case for holding the expectation of privacy to be reasonable." Here, appellant's reasonable expectation of privacy from governmental intrusion would not be defeated by her expectation that some inadvertent examination of the sealed garbage bags by the collectors might occur in the process of garbage removal.

A contrary conclusion is not compelled by Hoffa v. United States.[20] In that case, the United States Supreme Court held that the introduction into evidence of incriminating statements made by the defendants to or in the presence of a paid informer did not violate defendants' fourth amendment rights. Specifically, Justice Stewart, speaking for four members of the Court stated:

Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.[21]

*Hoffa* and the instant case, however, are distinguishable. There, the defendants knowingly and voluntarily communicated certain incriminating information to a third person who turned out to be a paid informer;[22] a communication to another was intentionally initiated and undertaken. Having intentionally conducted such communication, the defendants were obliged to assume the risk that the recipient of the communication might turn out to be a governmental agent. Their expectation of privacy, under such circumstances, was necessarily diminished. Here, the facts suggest that no such knowing or voluntary disclosure of the contents of the closed garbage bag to the collectors or any other person was initiated or attempted by appellant. If anything, the facts would seem to suggest that appellant and her husband expected the refuse collectors to "commingle" or destroy the garbage. If appellant had deposited personal letters rather than contraband into the dumpster, it could not be seriously maintained that she voluntarily and knowingly meant to communicate the contents of such letters to the collectors or police. It is more reasonable to infer that she expected the contents of her garbage to be intermingled with other refuse in the well of the truck, and ultimately dumped into a central collection place where the forces of nature would destory them. In short, without some attempt at knowingly communicating to a third person or knowingly disclosing to the public, appellant did not

expect privacy as to one class of persons or persons with one purpose, he may reasonably expect privacy as to the same or other classes with other purposes. A person may not expect privacy in his open field or backyard as against children at play or parents looking for lost or tardy children. Yet he may subjectively expect and objectively be entitled to expect privacy as against policemen making a 'dragnet' search of a whole group of private fields or a whole neighborhood of backyards in the

assumption that if they search long enough and far enough they will find some evidence of some crime.

20. 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), rehearing denied, 386 U.S. 940, 951, 87 S.Ct. 970, 17 L.Ed.2d 880 (1967).

21. *Id.* at 302, 87 S.Ct. at 413, 17 L.Ed.2d at 382.

22. *Id.*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed. 2d at 382.

have to assume the risk that such third persons might be paid informers or agents of the police. Her reasonable expectation of privacy against governmental intrusion remains intact.

I am also of the view that appellant's expectation of privacy was violated by an unreasonable governmental intrusion. The search was undertaken without a validly issued warrant. The state troopers occupied a camp-trailer and kept the dumpster and appellant's dwelling place under 24-hour surveillance for approximately twelve days. In other words, for almost two weeks, officials of the government observed, retrieved and inspected appellant's waste products without judicial approval and supervision before discovering the contraband. I find such unauthorized governmental invasion of personal privacy to be "unreasonable" and decline to join the court in encouraging such police conduct in the future. As the Supreme Court of California wisely cautioned in *Krivda*:

> We should hesitate to encourage a practice whereby our citizens' trash cans could be made the subject of police inspection without the protection of applying for and securing a search warrant.[23]

Authorizing warrantless police searches of private citizens' trash cans leaves the continued viability of the fourth amendment to the United States Constitution and article I, section 14 or article I, section 22 of the Alaska constitution dependent upon whether citizens hand mix their garbage with other waste materials in a dumpster, or whether they procure and use private incinerators and paper shredders. In my view, neither the United States Constitution nor the Alaska constitution should be construed so irrationally and narrowly.

Finally I disagree with the majority's holding insofar as it discriminates between the right to privacy of citizens occupying a single family dwelling, and those living in multiple unit dwelling places. In my opinion, such a distinction is unjustifiable as being either arbitrary or ultimately grounded upon impermissible economic discrimination among living unit dwellers. Nowhere in the text of the fourth amendment, article I, section 14 or article I, section 22 is the proviso, "for property owners only." Many, if not most, of our citizens cannot afford to own their own homes and live in single family dwellings. Further, some persons may prefer to live in apartments or condominiums. Moreover, many urban dwellers are obliged to reside in high rise apartment buildings, due to the crowded spatial conditions of our cities. To make the protection of the fourth amendment, article I, section 14 or article I, section 22 depend upon the economic status of an individual, life-stye preferences and urban spatial conditions is, in my opinion, unacceptable. The appropriate analytical focal point should be appellant's reasonable expectation of privacy. In my view, such expectation will remain constant, regardless of whether appellant's living unit is situated by itself on a spacious multi-acre estate or stacked upon others in a multi-unit apartment building. In other words, I am convinced that a resident's expectation that the police will not be scavenging through his or her garbage when such refuse is deposited in the only available waste receptacle for the living unit remains the same, whether the dweller resides in a split-level ranch home in the suburbs or in a crowded tenement in the inner city.

For the reasons mentioned above, I would reverse the trial court's denial of appellant's motion to suppress and grant appellant a new trial.

23.  5 Cal.3d 357, 364, 93 Cal.Rptr. 62, 69, 486 P.2d 1262, 1269 (1971).