BALL, Plaintiff in error, v. STATE, Defendant in error.

*No. State 79. Argued February 28, 1973.—Decided March 27, 1973.*
(Also reported in 205 N. W. 2d 353.)

For the plaintiff in error there were briefs and oral argument by *Howard B. Eisenberg*, state public defender.

For the defendant in error the cause was argued by *Robert D. Martinson*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

HANLEY, J. Four issues are raised on this appeal:
1. Did the police have probable cause to arrest the defendant?
2. Was the search of defendant's trash can invalid?
3. Was it error for the trial court to permit the officer to testify as to what he saw through the window of the storage trailer and to consider it in reaching a guilty verdict?
4. Is there sufficient evidence to support defendant's conviction of the crime of theft?

*Probable cause for arrest.*

Defendant's first contention is that the trial court was without jurisdiction to proceed in this case to trial. Since an arrest warrant had not yet been issued at the time he was taken into custody, only sec. 968.07 (1) (d), Stats., is relevant and provides that:

"(1) A law enforcement officer may arrest a person when:
"
. . .
"(d) There are reasonable grounds to believe that the person is committing or has committed a crime."

The "reasonable grounds" or what is more commonly referred to as probable cause, is not that quantum of evidence which might later support a conviction, rather it is " '. . . that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed a crime.' " *State v. Doyle* (1968), 40 Wis. 2d 461, 466, 162 N. W. 2d 60; *Molina v. State* (1972), 53 Wis. 2d 662, 671, 193 N. W. 2d 874.

At the time of defendant's arrest, the police knew that on August 9th, the Mausehunds had parked their camper-trailer at the "Petreikis' Resort" and that it disappeared without their consent from that location sometime between the evening of August 11th and the morning of August 12th. Similarly, they knew that a trailer matching the general description of the one taken had been seen at defendant's residence on the afternoon of the 12th but that it was gone that same evening. By pure chance, officer White noticed a similar trailer parked in the Olson garage on his way to work on the morning of August 14th and a subsequent investigation disclosed that it was the Mausehund trailer and that defendant had sold it to Olson in the late afternoon of August 12th.

These facts, we think, fit precisely into the rule that the ". . . unexplained possession of recently stolen goods raises an inference of greater or less weight, depending upon the circumstances, that the possessor is guilty of the theft . . . ." *State v. Johnson* (1960), 11 Wis. 2d 130, 139, 104 N. W. 2d 379.

*Search of trash can.*

At the hearing for postconviction relief, defendant contended that his fourth amendment rights had been violated by the failure of the trial court to suppress the cup and sandal which were found the early morning hours of August 15th by police in a "large barrel that had been used for burning" located "in the rear of the home."

Questions concerning the seizure of evidence which, although not actually in the defendant's house but which are, nevertheless, located on his property, have universally revolved around the decision of the supreme court in *Hester v. United States* (1924), 265 U. S. 57, 44 Sup. Ct. 445, 68 L. Ed. 898 and this court relied on it in several decisions. *Molina v. State* (1972), 53 Wis. 2d 662, 668, 193 N. W. 2d 874; *State v. Dombrowski* (1969), 44 Wis. 2d 486, 171 N. W. 2d 349. In *Hester,* officers had concealed themselves from Hester's father's house and they saw Hester leave the house and give a bottle to another person. When an alarm sounded, Hester dropped a jug which broke and his companion threw away the bottle, both attempting to flee from capture. At page 59, the court stated:

"The only shadow of a ground for bringing up the case is drawn from the hypothesis that the examination of the vessels took place upon Hester's father's land. As to that, it is enough to say that, apart from the justification, the *special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields.* The distinction between the latter and the house is as old as the common law." (Emphasis added.)

Although the "open fields" doctrine of *Hester* has been recognized and applied by the federal courts, virtually *all* circuit courts of appeals uniformly recognize that:

"The protection afforded by the Fourth Amendment, insofar as houses are concerned, has never been restricted to the interior of the house, but has extended to open areas immediately adjacent thereto. The differentiation between an immediately adjacent protected area and an unprotected open field has usually been analyzed as a problem of determining the extent of the 'curtilage.' " [1]

[1] *Wattenburg v. United States* (9th Cir. 1968), 388 Fed. 2d. 853, 857; *Fullbright v. United States* (10th Cir. 1968), 392 Fed. 2d 432; *Roberson v. United States* (6th Cir. 1948), 165 Fed. 2d 752; *United States v. Boyance* (3d Cir. 1968), 398 Fed. 2d 896; *United*

The question of whether the place is within the "curtilage" of the house, is a question of fact to be decided under all of the circumstances. *Care v. United States* (10th Cir. 1956), 231 Fed. 2d 22, 25.

Likewise, in *United States v. Potts* (6th Cir. 1961), 297 Fed. 2d 68, 69, the court states:

"Generally speaking, curtilage has been held to include all buildings, in close proximity to a dwelling, which are continually used for carrying on domestic employment; *or such place as is necessary and convenient to a dwelling, and is habitually used for family purposes.*" (Citations omitted.) (Emphasis added.)

In *Work v. United States, supra,* the District of Columbia Circuit Court had no difficulty in holding that articles seized from a trash can outside and under the house's steps were within that area constitutionally protected by the fourth amendment. In the case at bar, the record discloses only that the barrel "was in the rear of the house."

Although the federal courts have stood steadfast on their adherence to the "curtilage" test, there has emerged a more appropriate test for determining whether a search and seizure adjacent to a house is constitutionally protected.

In *Terry v. Ohio* (1968), 392 U. S. 1, 9, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889, the court stated:

"We have recently held that *'the Fourth Amendment protects people, not places,' Katz v. United States,* 389

States v. Campbell (4th Cir. 1968), 395 Fed. 2d 848; United States v. Mullin (4th Cir. 1964), 329 Fed. 2d 295; Wakkuri v. United States (6th Cir. 1933), 67 Fed. 2d 844; Rosencranz v. United States (1st Cir. 1965), 356 Fed. 2d 310; Work v. United States (D. C. Cir. 1957), 243 Fed. 2d 660; McDowell v. United States (8th Cir. 1967), 383 Fed. 2d 599; Hobson v. United States (8th Cir. 1955), 226 Fed. 2d 890; Kroska v. United States (8th Cir. 1931), 51 Fed. 2d 330; United States v. Potts (6th Cir. 1961), 297 Fed. 2d 68; United States v. Hollon (5th Cir. 1969), 420 Fed. 2d 302; United States v. Resnick (5th Cir. 1972), 455 Fed. 2d 1127.

U. S. 347, 351 (1967), and wherever an individual may harbor a reasonable 'expectation of privacy,' *id.*, at 361 (Mr. Justice HARLAN, concurring), he is entitled to be free from unreasonable governmental intrusion." (Emphasis added.)

Defendant contends that the warrantless search of the trash can violated his "reasonable expectation of privacy." The state's only answer to defendant's contentions is that the cup and sandal found in the trash can was abandoned, citing *Molina v. State, supra.*

In *Molina,* the defendants were observed throwing quantities of heroin onto a public street during a high-speed police chase. This court stated at page 669 that: ". . . when the powders were sprinkled over the highway, abandonment of any claim to control, possession or ownership was complete, final, and irrevocable." The case at bar presents a different situation.

Made a part of the record are several pictures of defendant's house which were taken from the adjacent highway. These pictures clearly indicate that the barrel could not be visible to any passerby on the road. Moreover, since defendant was arrested at a tavern several miles away from his house, it is presumed that he intended to return and that he never undertook one affirmative act by which it would be reasonably inferred that he intended to irrevocably relinquish his control or possession of the contents of the barrel. While it might be contended that because defendant "attempted" to burn the evidence, he thereby "intended" to "abandon" it, it would, nevertheless, seem that the decision to abandon the property under the facts of this case was a revocable decision which would not be made irrevocable until defendant either vacated the premises or in some way placed the barrel or its contents in "public view" outside his expectation of privacy. The several cases which address themselves to trash can searches and ques-

tions of abandonment clearly indicate that these are the determinative factors.

*Abel v. United States* (1960), 362 U. S. 217, 80 Sup. Ct. 683, 4 L. Ed. 2d 668, is the leading case on point. Colonel Abel, the notorious Russian spy was arrested in his hotel room and before being led away he was permitted to pack his belongings. Abel chose not to pack all of his belongings and several of the items he placed in the room's wastepaper basket before leaving. After Abel had left, the F. B. I., with approval of the hotel manager, searched the room and seized the items in the wastepaper basket. In sustaining the admission of the evidence, the court at page 241, stated:

*"This is so for the reason that at the time of the search petitioner had vacated the room.* The hotel then had the exclusive right to its possession, and the hotel management freely gave its consent that the search be made. . . . *So far as the record shows, petitioner had abandoned these articles. He had thrown them away."* (Emphasis added.)

In *United States v. Stroble* (6th Cir. 1970), 431 Fed. 2d 1273, 1276, evidence of a crime was held to be abandoned where it was "found lying by the side of two garbage cans adjacent to the curb" which was "not a part of the curtilage" and which "was observed by a police officer while he was still on a public street."

Although impliedly recognizing the *Katz* rationale ((1967), 389 U. S. 347, 88 Sup. Ct. 507, 19 L. Ed 2d 576), the Wyoming Supreme Court held in *Croker v. State* (Wyo. 1970), 477 Pac. 2d 122, 125, that defendant's expectation of privacy *ceased* upon trash collectors entering his property and thereafter removing it to the public alley where it was examined by police.

"It is our view that when defendant put his garbage in his garbage cans for purposes of removal he impliedly consented to entry upon his premises by the garbage col-

lectors in the regular performance of their duties and to the removal of the garbage by them to the alley, which was open to the public. *At that time* the officers or anyone else, if the garbage collectors did not object, were free to examine the contents of the collector's barrel." (Emphasis added.)

All of these cases which specifically involved the search of a trash can or barrel are distinguishable from the numerous cases which, although they recognize the applicability of the abandonment concept, are clearly premised on the fact that the particular search and seizure there involved took place beyond the curtilage and in the unprotected "open fields." [2]

In the case at bar, the defendant had his "barrel" in the back of his house on what would appear to be the curtilage of his house and hidden from the view of people passing by. There was no evidence that this was the type of container emptied by garbage men on a regular basis, or, for that matter, at all. In view of these facts and the above authorities, we are satisfied that the trash barrel was within defendant's expectation of privacy and the search of it was unlawful.

*Admission and consideration of officers' testimony.*

Defendant contends that it was error for the trial court to permit the officers to testify as to what they saw through the window of the storage trailer and to consider such testimony in reaching its verdict after it had suppressed both the items seized and the pictures of them as they existed in the trailer.

[2] E. g., *Care v. United States* (10th Cir. 1956), 231 Fed. 2d 22 (seizure of evidence in a plum thicket more than one-half mile from the house and in a cave, across a road and more than a long city block from the house); *United States v. Hassell* (6th Cir. 1964), 336 Fed. 2d 684 (open field 250 feet from house) and *Koth v. United States* (9th Cir. 1926), 16 Fed. 2d 59 (one-quarter mile from house).

Although the defendant at first blush has conceded that the property viewed through the window was within the plain view rule and, therefore, constitutionally proper, a careful review of recent cases relating to the application of the "plain view rule" discloses that such is not the case.

The United States Supreme Court in *Coolidge v. New Hampshire* (1971), 403 U. S. 443, 465, 91 Sup. Ct. 2022, 29 L. Ed. 2d 564, at page 465 stated:

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal." *See, State v. Pires* (1972), 55 Wis. 2d 597, 607, 201 N. W. 2d 153.

At page 466, the court set forth the two-pronged test which defines the exact scope of those circumstances:

"What the 'plain view' cases have in common is that the police officer in each of them had a *prior justification* for an intrusion in the course of which he came *inadvertently* across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." (Emphasis added) *Pires, supra,* at page 608.

The state has never contended that there was any "prior justification" for the police to be looking into the

trailer in the middle of the night, and at least an hour after and miles from the place where defendant was arrested. Moreover, it would be difficult if not impossible to justify what the officers saw through the windows as "inadvertent." The items as "seen" through the window were not within the "plain view" of the officers as that term is used in its constitutional sense. The trial court recognized this when it refused to accept either the evidence itself or the pictures of the inside of the trailer and it should have recognized that it would be error to rely to any extent on what the officers saw through the window in making its finding of guilty. We think it was error to admit the officers' testimony with respect to their observations of the items in the storage trailer.

*Sufficiency of the evidence.*

Contrary to defendant's contention in his brief, the trial court did make a specific finding of defendant's guilt beyond a reasonable doubt and while the state admits that this finding was totally based on circumstantial evidence, this court has stated on numerous occasions that such evidence is ". . . often . . . stronger and more satisfactory than direct evidence." *State v. Johnson, supra,* at page 135.

The evidence is overwhelming that the defendant in fact committed the theft of the camper-trailer. There is a reasonable inference of guilt because of the defendant's proven possession of the recently stolen camper. It was stolen on the same day that defendant possessed and sold it to Olson. There is no dispute that in fact the camper-trailer was stolen; there is no dispute that Mr. and Mrs. Mausehund were the owners; no dispute that they did not in fact give consent or permission to anyone to take the camper.

At trial, the defendant offered the testimony of his cousin's husband, Mr. Frederick Holm, Jr., as an alibi. Holm testified that he and the defendant worked on

Holm's car on the afternoon of the 12th, they went out to a bar until closing and that they, thereafter, went hunting for deer. Holm testified that he and the defendant were out all night and returned only in time for breakfast about 7:30 a. m. Mrs. Holm confirmed that the two men had returned very early on the morning of the 12th and that after breakfast, the defendant departed about 7:30 a. m.

The defendant testified that after leaving the Holm house on the morning of the 12th, he went to a restaurant in Crandon for coffee and while there, a man who later identified himself as Paul Harris approached him and asked if he wanted to buy a camper-trailer. The defendant then testified that he told Harris that he had two buyers for such a trailer, and that he did in fact purchase the trailer for $300. At trial, defendant produced a scrap of paper about three inches by three inches which read as follows:

"Aug. 10, 1879

"Received of Charles Ball $300.00 for camper trailer. Paul Harris. Paid in full."

From the time of his arrest the receipt was in defendant's wallet which was at all times in police custody. Defendant testified that although he noticed the discrepancy in the date at the time it was given to him that was the way Harris had written it out.

The trial court, in disposing of defendant's alibi as unbelievable, placed some emphasis on the fact that the receipt was of questionable "authenticity." Although defendant and Holm testified that they did not leave the bar until it closed in the early morning hours of the 12th, both officer Knoll and deputy sheriff White testified that they found the defendant sleeping in his car at about 11 p. m. on the 11th in the parking lot of the tavern.

Although the trial court erroneously admitted into evidence the cup and sandal obtained as a result of an

illegal search, together with the testimony of the officer as to items observed in the storage trailer, we think such error was harmless. "The test of harmless error is not whether some harm has resulted, but, rather, whether the appellate court in its independent determination can conclude there is sufficient evidence other than and uninfluenced by the inadmissible evidence, which would convict the defendant beyond a reasonable doubt." *Wold v. State,* ante, p. 344, 356, 204 N. W. 2d 482.

Here, the inference of guilt because of the defendant's proved possession and sale of the camper-trailer on the same day it was stolen is of itself sufficient. There is no dispute as to the theft; there is no dispute that Mausehunds were the owners; no dispute that they did not in fact give consent to anyone to take the camper; and as for credibility, the trial court was justified in disbelieving all testimony of the defendant and his witnesses.

*By the Court.*—Order affirmed.

ROBERT W. HANSEN, J. *(concurring).* A garbage can is not a safety-deposit box. It is not an alternative place of safekeeping. Rather, it is a place for discarding waste materials. Abandonment derives from the owner's knowledge that the discarded materials may be picked up by trash collectors five minutes later—or five hours or five days. The writer would see the test, not where on the property the garbage container awaits the trash collector's visit, but whether it is placed so as to be available for pickup. That the trash barrel here was at the rear of the home does not place it beyond the trash collector's pickup service, unless it is established that garbage and trash collectors in the community involved made only curbside pickups. In the case before us, the trash collectors surely had the right to entry on the premises to remove the contents of garbage and trash containers standing to the rear of the house. On this record, as to the search of the trash barrel, the writer would find no

"reasonable expectation of privacy" reached, much less disturbed. Where, as to such search, the majority finds harmless error, the writer would find no error at all.