GEORGE H. HANDY, M.D., State Health Officer, Department of Healthand Social Services
You ask my advice on this question:
 "To accomplish public health protection as well as prevention of ground water pollution, can the Door County Health Commission authorize staff to enter private property for the purpose of determining the location of an existing private sewage disposal system, including where necessary, probing on the property and excavation of such amount of cover material as is necessary to locate the site and nature of the disposal of the sewage liquid on the property?"
It is my opinion that the Door County Health Commission (hereinafter called "the Commission") can authorize its staff to engage in the activity described in your above-stated question,but only where such activity is undertaken with the consent ofthe property owner. If such consent is not obtained, it is my further opinion that such activity could only be undertaken on the nonconsenting property owner's premises pursuant to a special inspection warrant obtained pursuant to sec. 66.122, Stats.
It is clear that the Commission has ample statutory power to conduct sanitary surveys which would involve activity by Commission personnel of the kind described in your question. Under *Page 338 
sec. 141.01 (5), the Commission is empowered and obligated to "take such measures as shall be most effectual for the preservation of the public health." The health director of the Commission has the duty (and the concomitant power) to, "Make an annual sanitary survey and maintain continuous sanitary supervision over his territory." Sec. 141.01 (6) (a), Stats. Under sec. 141.01 (7), the Commission has "all the powers now vested in local boards of health and local health officers . . ." Under sec. 141.015 (6), Stats., a local board of health has the duty and concomitant power to "take such measures as shall be most effectual for the preservation of the public health," and this power is that of a county health commission under sec. 141.01 (7), Stats., although the same power, as noted above, is conferred on such a commission by sec. 141.01 (5), Stats. In the light of these statutory provisions, I believe it manifest that the Commission can authorize its personnel to engage in the activity in question, to be undertaken, however, only with the property owner's consent.
In any instance in which the property owner refused to consent to such activity on his premises, then the Commission could, I believe, have resort to sec. 66.122, Stats. It provides:
 "Special inspection warrants. (1) All state, county, city, village and town officers and their agents and employes, charged under statute or municipal ordinance with powers or duties involving inspection of real or personal property including buildings, building premises and building contents, for, without limitation because of enumeration, such purposes as building, housing, electrical, plumbing, heating, gas, fire, health, safety, environmental pollution, water quality, waterways, use of water, food, zoning, property assessment, meter, and weights and measures inspections and investigations, shall be deemed peace officers for the purpose of applying for, obtaining and executing special inspection warrants under s. 66.123.
 "(2) Except in cases of emergency where no special inspection warrant shall be required, special inspection warrants shall be issued for inspection of personal or real properties which are not public buildings or for inspection of portions of public buildings which are not open to the public only upon showing that consent to entry for inspection purposes *Page 339 
has been refused. The definition of `public building' under s. 101.01 (2) (h) applies to this section."
The above-quoted statute, and sec. 66.123, Stats., setting forth illustrative forms for use under see. 66.122, Stats., constitute a response of our legislature to the decision handed down by the United States Supreme Court in Camara v. MunicipalCourt (1967), 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930. InCamara, the Court recognized that in certain emergency situations, prompt inspection of premises by health authorities, even without a warrant, was proper. As examples of such situations, the court cited seizure of unwholesome food; compulsory smallpox vaccination; health quarantine; and summary destruction of tubercular cattle. See 18 L.Ed.2d at 941;387 U.S. at 539. The question with which this opinion deals plainly contemplates no such emergency situation, and nothing in your letter to me presenting such question indicates the presence of an emergency situation which causes the Commission to desire to undertake the activity described in such question. The situation which apparently has produced the Commission's desire to undertake such activity would, then, appear to be of a non-emergency nature, subject to the key Camara holding that under the Fourth Amendment, applicable to the states through the due process clause of the Fourteenth Amendment, a person has a constitutional right to insist that administrative searches to enforce a state, a county, or municipal fire, health, or housing inspection program be made pursuant to search warrant.
Referring to language found in sec. 66.122 (1), it is my opinion that officers or employes of the Commission would be ". . . county . . . officers and . . . employes, charged under statute . . . with powers or duties involving inspection of real or personal property including buildings, building premises and building contents, for, without limitation because of enumeration, such purposes as . . . environmental pollution, water quality, . . . [and] use of water . . ." With Commission officers and employes so charged, they are, under the provisions of see. 66.122 (1), to be "deemed peace officers for the purpose of applying for, obtaining and executing special inspection warrants under s. 66.123."
In closing this opinion, it seems advisable to me to point out that I would assume that at least in most instances, if not all, a private *Page 340 
sewage disposal system is within the "curtilage" of the house which it serves. The importance of this is that, as recently noted by the Wisconsin Supreme Court, the protection afforded by the Fourth Amendment, insofar as houses are concerned, has never been restricted to the interior of the house, but has extended to open areas immediately adjacent thereto. Ball v. State (1972),57 Wis.2d 653, 660, 205 N.W.2d 353. In Ball, the Court went on to cite language to the effect that the differentiation between an immediately adjacent protected area and an open field unprotected by the Fourth Amendment has usually been analyzed as a problem of determining the extent of the "curtilage." The Court in Ball then went on to cite the following language from United States v.Potts (1961-6 C.A.), 297 F.2d 68, 69:
 "Generally speaking, curtilage has been held to include all buildings in close proximity to a dwelling, which are continually used for carrying on domestic employment; or such place as is necessary and convenient to a dwelling, and is habitually used for family purposes." (Emphasis added.)
It would seem clear that the average private sewage disposal system would fall into the category of "such place as is necessary and convenient to a dwelling, and is habitually used for family purposes," so that the protection afforded by the Fourth Amendment would apply thereto, and a search of such place, unless performed with the owner's consent or in an emergency such as that above described, can be lawfully undertaken only if pursuant to a search warrant.
RWW:DCM:JHM